UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

---

Mary E. Gaidry :
:
     Plaintiff :
: CIVIL ACTION: _____
  v. :
:
LCMC Health d/b/a New Orleans East : JURY TRIAL REQUESTED
Hospital and Tulane Lakeside Hospital :
:
     Defendant :

---

# COMPLAINT

## I. PRELIMINARY STATEMENT

1. The Plaintiff, Mary E. Gaidry, a qualified person with a disability, contends that Defendant LCMC unlawfully denied her an available contract work for which she was qualified because of her disability. Plaintiff brings this action for monetary damages and injunctive and declaratory relief against Defendant for violation of her rights under Title I of the Americans with Disabilities Act (ADA), 42 U.S.C. §12110 and Section 504 of the Rehabilitation Act of 1973, as amended (Section 504), 29 U.S.C. §794, *et seq.*

## II. JURISDICTION

2. The jurisdiction of this Court is invoked pursuant to 29 U.S.C. §§1331 and 1343(4). Declaratory relief is sought pursuant to 28 U.S.C. §§2201 and 2202. Venue is proper in this District under 28 U.S.C. § 1391(b) because, among other things, Defendants reside in this District and the acts and omissions giving rise to this Complaint occurred in this District.

## III. PARTIES

3. Plaintiff, who is a resident of Franklinton, Louisiana, is a person with a disability under the ADA and Section 504. She has Lupus. Lupus is a "chronic (long-lasting) autoimmune

disease" which "occurs when the immune system, which normally helps protect the body from infection and disease, attacks its own tissues." *See Systemic Lupus Erythematosus (Lupus),* NIH, https://www.niams.nih.gov/health-topics/lupus (last visited Oct. 12, 2023). She also has postural orthostatic tachycardia syndrome ("POTS") because of damage to her body caused by lupus. POTS is a blood circulation disorder that can cause "lightheadedness (occasionally with fainting), difficulty thinking and concentrating (brain fog), fatigue, intolerance of exercise, headache, blurry vision, palpitations, tremor [or] nausea." *See Postural Orthostatic Tachycardia Syndrome (POTS),* Johns Hopkins Medicine, https://www.hopkinsmedicine.org/health/conditions-anddiseases/postural-orthostatic-tachycardia-syndrome-pots (last visited Oct. 12, 2023). Plaintiff also suffers from episodes in which she experiences tremors that resemble seizures.

4.  Defendant, LCMC Health, is a non-profit healthcare company that operates and manages New Orleans East Hospital ("NOEH") and Tulane Lakeside Hospital. The LCMC, New Orleans East Hospital, and Tulane Lakeside Hospital are recipients of federal financial assistance. LCMC employs over 500 people. LCMC employed Plaintiff as a Diagnostic Sonographer through its contract with X-Tech, a staffing agency.

### IV. STATEMENT OF FACTS

5.  Plaintiff is a highly trained and experienced Diagnostic Sonographer or Ultrasound Technician. Plaintiff worked in this capacity at two hospital locations for LCMC through her staffing agency, X-Techs. The first location was at NOEH, where she has worked on and off since approximately 2007. The second was at Tulane Lakeside Hospital, where she began receiving work assignments in 2021.

6.  Due to her disabilities, Plaintiff uses service dogs. Her dogs (a) alert her in the event of a blood pressure drop or impending tremors; (b) help with the PTSD by assisting her to calm down; and

(c) steady her when she becomes dizzy. To Plaintiff, her dogs have been a life saver and have greatly enhanced her ability to manage her life with chronic illness.

7. Plaintiffs' dogs are fully trained, vaccinated, and regularly seen by a qualified Veterinarian for proper care. Plaintiff bathes and grooms the dogs prior to coming to client locations. The dogs are leashed and stay with her at all times.

8. Plaintiff first brought a service dog to work with her following the COVID pandemic in approximately mid-2021. She began bringing a service dog with her to work when she was placed at the NOEH location in July of 2021.

9. Issues relating to Plaintiff's use of her service dog arose first at NOEH. Beginning in late 2021, Plaintiff was repeatedly subjected to harassment by staff members because they stated that they were afraid of the animals and did not want to be around them. Notwithstanding these complaints, Plaintiff continued to receive work assignments at the hospital.

10. One morning in late September or October 2022, Plaintiff reported to work with one of her dogs, Mika. The plaintiff was stationed in one of the hospital's ultrasound procedure rooms, which are not considered to be sterile environments. Unknown to the Plaintiff, a breast biopsy had been scheduled to take place in the room and that such a procedure was considered by LCMC to require a sterile environment.

11. Plaintiff did not learn of the scheduled biopsy until another technician, who was scheduled to work that day, arrived later and alerted her to that fact.

12. Unlike more invasive medical procedures, an "[u]ltrasound-guided . . . breast biopsy is a clean procedure, . . . not a strictly sterile one." Techniques for ultrasound-guided, percutaneous core-needle breast biopsy, *Applied Radiology* (Mar. 4, 2013), https://appliedradiology.com/articles/techniques-forultrasound-guided-percutaneous-core-needle-breast-biopsy.

13. At some point that day, before the biopsy occurred, I noticed Mika's hair on the floor and notified the other technician who called housekeeping. Housekeeping staff were upset about having to remove the dog hair.

14. Later that day, Sherry Jacob—Plaintiff's X-Techs supervisor—called Plaintiff asking why she and Mika were in a sterile area. Plaintiff informed Ms. Jacob that she was at her regular—non-sterile— work location and had not been notified that the procedure would be conducted in that same area later in the day.

15. Shortly thereafter, the staffing agency and NOEH management developed a protocol for Plaintiff's use of the service dog. In accordance with the protocol, Plaintiff was required to notify patients, in advance, that she will bring a service dog to the room and must ascertain how the patient will be impacted. If the patient is in or will be in a sterile environment, has a dog allergy, or a fear of dogs, then she will not provide services to that patient.

16. Once the protocol was developed, Plaintiff implemented it. However, since her dogs were so well behaved, even when she brought one to a room in which there was a patient, the vast majority of the patients forgot that it was there.

17. Under the protocol, when co-workers have a dog allergy, Plaintiff will accommodate the fellow employee by not staying in shared areas at the same time as that employee.

18. Notwithstanding this protocol, hospital staff withdrew permission for Plaintiff to work on-call shifts since she would be the only ultrasound tech at the hospital if called in.

19. At no point did LCMC give any consideration to potential modifications that would permit Plaintiff to continue in her position while also mitigating LCMC's concerns, such as temporarily using a crate for the dog if Plaintiff were required to be present in a sterile environment.

20. On or about November 8, 2022, Plaintiff was told by NOEH that the service animals would be confined to her station, and therefore Plaintiff could not leave her post with a dog accompanying her.

21. On or about November 22, 2022, Ms. Jacob (the X-Techs supervisor) contacted Plaintiff to outline additional conditions that LCMC had requested for her continued work at NOEH. The provisions included that: (1) Plaintiff confine herself to her ultrasound room, (2) she brush her service animal prior to a shift, and (3) she inform patients of the dog's presence.

22. On the same date, Ms. Jacob requested proof that Mika was a service animal. Plaintiff noted that she was under no obligation to do so and thus declined. However, later that month, Ms. Jacob requested a doctor's note explaining why Plaintiff needed to use a service animal. Plaintiff complied with this request and eventually delivered the note.

23. On New Year's Eve of 2022, Plaintiff—that day stationed at LCMC's Tulane Lakeside Hospital— ran into unidentified LCMC administrators in the hallway and expressed her concerns about how she had been treated when she was working at NOEH. Although the individuals stated that they were unaware of the October incident, they said they would follow up with Plaintiff later.

24. On or about January 23, 2023, Plaintiff was informed by Ms. Jacob that X-Techs had been notified that she would not be permitted to work at any LCMC facility due to a perceived infection risk stemming from the presence of the service animals. Additionally, Ms. Jacob alluded to housekeeping's complaints about the dog's hair, and asked whether Plaintiff would be willing to sweep it up herself. She then advised Plaintiff that other facilities had similar concerns, and that she would not be able to bring her dogs to work with her. Plaintiff provided Ms. Jacobs with information from the Centers for Disease Control and other sites discussing the incorporation of service animals into hospitals.

25. Plaintiff soon thereafter learned that a radiology manager at Lakeside had also complained about her service dog's hair.

26. On February 3, 2023, Plaintiff and Ms. Jacob discussed the situation again. Ms. Jacob told Plaintiff that she would not be scheduled for the following week.

27. Plaintiff has not been scheduled to work at either NOEH or Tulane Lakeside since February 2023.

28. Plaintiff had been regularly scheduled to work at LCMC locations for many years without significant incident. Neither the quality of her work nor her professionalism have ever been formally questioned. Indeed, it was not until early 2023, after the hospitals became increasingly focused on Plaintiff's service animals, that her opportunities to work at LCMC locations ceased.

29. Plaintiff continues to receive messages from recruiters seeking ultrasound techs for work at LCMC locations. However, LCMC has declined to assign shifts to Plaintiff after the issues arose relating to her use of a service animal.

30 LCMC also failed to accommodate Plaintiff's disability. LCMC's has placed restrictions on Plaintiff's staffing because she worked with a service animal.

31. Instead of engaging in a meaningful dialogue with Plaintiff about the use of her dog in its hospitals and any potential accommodations that could be made if Plaintiff was needed for a period in an area where the service animal would not be permitted (*e.g.,* crating the dogs when necessary), LCMC took adverse employment action against her—reducing her potential work schedule to only shifts where another technician was already present. Ultimately, she stopped receiving shifts altogether.

## V.   FIRST CAUSE OF ACTION

32.   The allegations contained in paragraphs 3-31 are incorporated by reference herein.

33.   Plaintiff has exhausted her administrative remedies by timely filing a complaint against Defendant with the Equal Employment Opportunity Council (EEOC) and receiving a right to sue letter on November 9, 2023.

34.   Defendant's actions of reducing and eventually terminating Plaintiff's work schedule solely because of her disability and failing to provide her with reasonable accommodations constitute employment discrimination against a qualified disabled person in violation of Title I of the Americans with Disabilities Act, 42 U.S.C. §121101.

## VII.   SECOND CAUSE OF ACTION

35.   The allegations contained in paragraphs 3-31 are incorporated by reference herein.

36.   Defendant's actions of reducing and eventually terminating Plaintiff's work schedule, solely because of her disability, and failing to provide her with reasonable accommodations constitute employment discrimination against a qualified disabled person in violation of §504 of the Rehabilitation Act of 1973, 29 U.S.C. §794.

## VIII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

A.   Assume jurisdiction of this action.

B.   Declare that the actions of the Defendant, described herein, discriminate against Plaintiff because of her disability in violation of federal law under Title I of the ADA and Section 504 of the Rehabilitation Act.

C. Issue a Permanent Injunction requiring that Defendant provide Plaintiff with employment on, at least, to the same extent, and on the same terms and conditions, as the job she was performing prior to January 2023.

D. Award the Plaintiff back pay and compensatory damages.

E. Award the Plaintiff her costs and reasonable attorney's fees.

F. Award such other relief as the Court may deem just, necessary, and proper.

Respectfully submitted this 31st day of January 2024.

                              MARY E. GAIDRY

                              By her attorney,

/s/ Ronald K. Lospennato
Ronald K. Lospennato, La. Bar No. 32191
The Law Office of Ronald K. Lospennato
650 Poydras St., Suite 1400
New Orleans, LA 70130
Telephone: 504-407-7454
Facsimile: 504-335-2890
Email: ron@lospennatolaw.com